FILED

2009 Sep-28  AM 11:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DEPARTMENT OF TEXAS** | ) | |
| **VETERANS OF FOREIGN WARS** | ) | |
| **OF THE UNITED STATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 07-S-2144-NE** |
| | ) | |
| **BLAKE DORNING, in his official** | ) | |
| **capacity as the Sheriff of Madison** | ) | |
| **County, Alabama,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This action was commenced by an entity that identifies itself as "The Department of Texas Veterans of Foreign Wars of the United States." Jurisdiction is based upon the parties' diversity of citizenship, *see* 28 U.S.C. § 1332(a)(1), and federal questions. *See* 28 U.S.C. §§ 1331, 1983. Among other relief requested, plaintiff asks this court to declare that the electronic gaming machines it formerly operated in the Town of Triana, Alabama, constituted legal "bingo" games, and to enjoin defendant, Blake Dorning, in his official capacity as the Sheriff of Madison County, Alabama, from applying Alabama Code §§ 13A-12-22 and 13A-12-27 — which make it unlawful to promote gambling and to possess a gambling device — to plaintiff's gaming operations. These claims arise out of defendant's search of

plaintiff's Triana gaming facility during November of 2007, an event that led to the seizure of 200 electronic bingo machines manufactured by Nova Gaming, LLC.

The action is before the court on cross motions. Defendant renews his previously rejected motion asking the court to abstain, or to utilize the certification process established by the Alabama Supreme Court. *See Alabama Rule of Appellate Procedure* 18.[1] In the alternative, defendant moves for summary judgment on all claims.[2] Plaintiff also seeks summary judgment, but only as to the legality of its "electronic bingo games," reserving for trial its constitutional claims and prayers for injunctive relief.[3]

That aspect of defendant's present motion, reiterating defendant's request that this court abstain from addressing the issues raised in plaintiff's complaint, or certify certain dispositive questions to the state supreme court, fails to offer any argument

---

[1] The Alabama Rule of Appellate Procedure cited in text provides, in part, that:

> When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer.

Ala. R. App. P. 18(a).

[2] *See* doc. no. 56 (Defendant's Motion for Summary Judgment and Renewed Motion to Abstain or Certify).

[3] *See* doc. no. 60 (Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games).

2

not already addressed in the pleadings supporting the original motion[4] and rejected in the order entered on March 26, 2008.[5]   Accordingly, that aspect of defendant's motion will, again, be denied.   For the reasons set forth below, however, the alternative aspect of defendant's motion, seeking summary judgment in defendant's favor on all of plaintiff's claims, will be granted; and, plaintiff's motion for partial summary judgment on the legality of its electronic bingo games will be denied.

## I.  STANDARDS OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[6]  In other

---

[4] *See* doc. nos. 9 (Defendant's Motion to Dismiss or, in the Alternative, to Abstain) and 11 (Defendant's Reply to Plaintiff's Response to Defendant's Motion to Dismiss or, in the Alternative, to Abstain).

[5] *See* doc. no. 15 (order denying defendant's motion to abstain/certify).  Alabama Rule of Appellate Procedure 18(a), *see supra* note 1, has a facial attraction, especially in cases such as this one, in which close questions of Alabama law are raised for the first time in a federal forum.  Even so, this court has invoked the procedure outlined in that rule in two previous actions, only to have the Supreme Court of Alabama refuse to respond to the certified questions.  *See*, *e.g.*, *Price v. Time, Inc.*, 416 F.3d 1327, 1333-34 (11th Cir. 2005) (observing that, "[t]o the disappointment of the district court (and this one as well), the Alabama Supreme Court declined to answer the certified question").  Contrary to the old adage, a third request would be no more charming than the first two.

[6] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

When presented with cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright, Miller & Kane, *Federal Practice and Procedure:  Civil 3d* § 2720, at 335-36 (1998) (footnote omitted); *see also, e.g., Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986).  Further, the court is required to "relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico*, *Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## II.  SUMMARY OF FACTS

The Department of Texas Veterans of Foreign Wars of the United States ("Texas VFW") allegedly is a non-profit organization that purportedly participates in charitable activities in Texas and other states.[7]  Kenneth Burton, a corporate representative of the Texas VFW, is an attorney licensed to practice in Texas and Oklahoma.[8]  He became acquainted with Gary Watkins, a gaming machine vendor,

---

[7] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 1 (Declaration of Kenneth R. Burton, Jr.), ¶¶ 3-4.

[8] *See* doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. O (Deposition of Kenneth R. Burton, Jr.), at 13-14.

while Watkins was working with a VFW post in Texas.[9]  When Burton learned of Watkins's interest in establishing gaming operations in this state, Burton introduced him to a representative of the Alabama VFW.[10]  That introduction led to the establishment of gaming operations in Triana, involving the Alabama VFW and Gary Watkins.[11]  For making the introduction, Burton received payments totaling $20,000 over a period of four to five months.[12]  Those payments represented one-half of one percent (0.005%) of the proceeds received by Watkins as a result of the Triana gaming operations.[13]  The payments were made to Burton, personally; the Texas VFW received no remuneration.[14]

When the payments to Burton ceased due to the closing of the gaming operations established by Watkins, Burton contacted a representative of the Alabama VFW to ask whether they intended to resume play.[15]  After being told that the Alabama VFW did not intend to do so, Burton inquired about opportunities for a joint venture.[16]  While exploring the potential for new gaming operations in Alabama,

---

[9] *See id.* at 27-28.

[10] *See id.* at 30-31.

[11] *See id.* at 30-31.

[12] *See id.* at 31.

[13] *See id.* at 42.

[14] *See* doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. O (Deposition of Kenneth R. Burton, Jr.), at 32.

[15] *See id.* at 26.

[16] *See id.* at 26-27.

Burton spoke with Chuck Gibbs, the Oklahoma attorney for Gary Watkins, "to see if there was a vendor in the area that could run an operation and do it correctly."[17] Gibbs gave Burton contact information for an individual named Bernie Gomez.[18] Gibbs also called Gomez to advise him that, "if he [Gomez] was interested in doing something in Triana, [the] Texas VFW [acting through Kenneth Burton] was interested in being involved."[19]

In the late Summer of 2007, Gomez agreed with Burton on behalf of the Texas VFW that he would "do the deal for them."[20]  Under this agreement, it was Gomez's responsibility to structure and run the operation, and Burton's responsibility to "provide the charities that . . . would allow [Gomez] to get the [bingo] sessions."[21] Gomez is neither a military veteran nor a member of any VFW Post.[22]  Burton and Gomez concluded that Gomez's compensation would need to be based upon the structuring of companies to "perform functions for the service of the operation."[23]

Before the commencement of gaming operations, Gomez formed an entity

---

[17] *Id.* at 44-45.

[18] *See id.* at 45.

[19] *Id.* at 34.

[20] Doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. A (Deposition of Bernard Gomez), at 55-56.

[21] Deposition of Kenneth R. Burton, Jr., at 186.

[22] *See* Deposition of Bernard Gomez, at 16.

[23] Deposition of Kenneth R. Burton, Jr., at 52-53.

known as "GQ, LLC" for the purpose of providing video gaming machines to the Triana operation in exchange for thirty percent of gross receipts.[24]   Between December 2007 and January 2008, after the commencement of the gaming operations at issue in this litigation, Gomez  formed six additional limited liability companies, and caused the execution of formal written contracts between those companies and the Texas VFW.[25]  Specifically, Gomez formed "Huntsville Internet Technologies, LLC" for the purported purpose of providing technology assistance to the Triana operations in exchange for twenty-one percent of gross receipts;[26] "Madison County Accounting, LLC" for the alleged purpose of providing accounting services in exchange for $250 a month;[27] "AMEX Security, LLC"  for the asserted purpose of providing security services in exchange for twenty percent of gross receipts;[28] "Triana Janitorial Service LLC" for the purported purpose of providing janitorial services in

---

[24] *See* Deposition of Kenneth R. Burton, Jr., at 89-91, 150-52, Exhibit 48 (Video Bingo Machine Agreement); Deposition of Bernard Gomez, at 75-76, 79, 81, Exhibit 2 (Articles of Organization of GQ, LLC).

[25] *See* Deposition of Bernard Gomez, at Exhibits 1-13.

[26] *See* Deposition of Kenneth R. Burton, Jr., at 89-91, 154-56, Exhibit 49 (IT Services Agreement); Deposition of Bernard Gomez, at 84, Exhibit 4 (Articles of Organization of Huntsville Internet Technologies, LLC).

[27] *See* Deposition of Kenneth R. Burton, Jr., at 105-08, Exhibit 43 (Accounting Services Agreement); Deposition of Bernard Gomez, at 86-87, Exhibit 5 (Articles of Organization of Madison County Accounting, LLC).

[28] *See* Deposition of Kenneth R. Burton, Jr., at 89-92, 119-22, Exhibit 44 (Security Services Agreement); Deposition of Bernard Gomez, at 82-83, Exhibit 3 (Articles of Organization of Amex Security, LLC).

exchange for five percent of gross receipts;[29] "Triana Maintenance, LLC,"  for the alleged purpose of providing maintenance services in exchange for five percent of gross receipts;[30] and "Triana Vending, LLC" for the asserted purpose of providing food services in exchange for at least nine percent of the gross receipts from the gaming operation.[31]   These shares of the gaming operation's gross receipts total ninety percent, which means that the $250 a month fee specified for "Madison County Accounting, LLC" — as well as those fees mentioned in the following paragraph, and all unspecified expenses — had to be paid from only ten percent of gross revenues.

In addition to the percentages of gross revenues received by Gomez and the limited liability companies he created and controlled, Burton and Gomez agreed that Gomez would receive a $30,000 fee after he "put everything in place."[32]   Chuck Gibbs, the Oklahoma attorney for Gary Watkins who had introduced Burton to Gomez, was to become part of the legal team of the operation.[33]   Mark Burton, the son of Kenneth Burton, formed "Municipal Financial Services, LLC" to administer and

---

[29] *See* Deposition of Kenneth R. Burton, Jr., at 89-91, 128-30, Exhibit 45 (Janitorial Services Agreement); Deposition of Bernard Gomez, at 88, Exhibit 6 (Articles of Organization of Janitorial Services, LLC).

[30] *See* Deposition of Kenneth R. Burton, Jr., at 89-91, 125-27, Exhibit 46 (Building Maintenance Agreement); Deposition of Bernard Gomez, at 91-92, Exhibit 7 (Articles of Organization of Triana Maintenance, LLC).

[31] *See* Deposition of Kenneth R. Burton, Jr., at 159-161; Deposition of Bernard Gomez, at 93, 134, Exhibit 8 (Articles of Organization of Triana Vending, LLC).

[32] Deposition of Bernard Gomez, at 56.

[33] *See id.* at 96.

handle financial matters arising from the operation at a rate of $75 an hour, plus expenses.[34]

After reaching an agreement with Gomez, Burton sought the approval of the Texas and Alabama VFWs for the gaming operations in Triana.[35]  In the process of doing so, Burton did not disclose to the Texas VFW that he had a personal stake in the prior Triana gaming operations established by Gary Watkins.[36]  On August 10, 2007, the Texas VFW entered into a "Fund Raising Revenue Participation Agreement" with the Alabama VFW that allowed the Texas VFW to conduct  bingo operations in the State of Alabama.[37]  Under the terms of that agreement, the Alabama VFW was to have no responsibilities in connection with the gaming operations,[38] but was to receive a portion of the revenue generated by the Texas VFW's operation of *any* bingo game in the State of Alabama.[39]  The Triana gaming operations were structured so that seven percent of *net* revenue was payable to the Texas VFW, and three percent of *net* to the Alabama VFW.[40]  As detailed in the two paragraphs

---

[34] *See* Deposition of Kenneth R. Burton, Jr., at 92-94, Exhibit 42.

[35] *See id.* at 54, 56-59, 62, Exhibits 3-5.

[36] *See id.* at 54.

[37] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 5 (Fund Raising Revenue Participation Agreement).

[38] *See* Deposition of Kenneth R. Burton, Jr., at 60-62.

[39] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 5 (Fund Raising Revenue Participation Agreement).

[40] *See* Deposition of Kenneth R. Burton, Jr., at 60-61.

proceeding this one, however, more than ninety percent of the *gross* revenues was to be paid to Gomez and the limited liability companies created and controlled by him.[41] Thus, the *net* revenues payable to the Alabama and Texas VFWs were calculated on less than ten percent of the gross receipts.

After Burton obtained the approval of from the Texas and Alabama VFWs, Gomez met with the Mayor of Triana, and with an investor and other persons interested in becoming involved in some capacity with the Triana gaming operations.[42] Gomez borrowed and spent approximately One-Half Million Dollars in the process of setting up the gaming operations.[43] Gomez leased, in his own name, the building in which gaming operations originally were conducted.[44] He also paid rent on the building, and paid for all renovation and remodeling work necessary to ready the structure for gaming operations.[45] Allegedly, Gomez never received reimbursement for that rent or those renovation expenses.[46] Gomez also made arrangements for Nova Gaming, LLC to supply video gaming machines for the operation in exchange for twenty-five percent of operation receipts, which was to be

---

[41] *See id.* at 61.

[42] *See* Deposition of Bernard Gomez, at 36-39, 44-45, 105, 107.

[43] *See id.* at 105-07.

[44] *See id.* at 41-42.

[45] *See id.* at 46.

[46] *See id.* at 76-77.

11

paid from the thirty percent of gross receipts payable to GQ, LLC.[47]

Gomez also paid for the Town of Triana's bingo license applications for the various VFW posts allegedly conducting gaming operation within the rented facility.[48] Gomez obtained licenses for at least twenty Texas VFW posts,[49] each of which purports to be an autonomous non-profit corporation.[50] Gomez also paid the Town of Triana's licensing fees for each of the gaming machines, totaling $12,000.[51]

Only two persons allegedly associated with the Texas VFW were involved in the Triana gaming operations, Larry Sepanski and Kymberlee Bradley, but neither individual had any preexisting or significant ties to that organization.[52] Larry Sepanski, for example, has been a member of *Alabama VFW Post 4190 in Decatur, Alabama*, since 1994.[53] Like Burton, Sepanski had been involved with Gary Watkins in the prior Alabama VFW gaming operation in Triana.[54] In the former operation,

---

[47] *See* Deposition of Bernard Gomez, at 102; doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. E (Deposition of Nova Gaming, LLC representative Michael E. Fletcher), at 204-05.

[48] *See* Deposition of Kenneth R. Burton, Jr., at 205-06; Deposition of Bernard Gomez, at 108-09.

[49] *See* doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. P (Deposition of Sharron Humphrey), at Exhibits 10-32.

[50] *See* Deposition of Kenneth R. Burton, Jr., at 22.

[51] *See* Deposition of Bernard Gomez, at 108-09.

[52] *See id.*; Deposition of Kenneth R. Burton, Jr., at 110, 114.

[53] *See* doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. C (Deposition of Lawrence O. Sepanski), at 7, 10.

[54] *See id.* at 17-18.

Sepanski had served as a greeter and golf cart driver.[55]  In August of 2007, Burton offered Sepanski the opportunity to become a "member-at-large" of the Texas VFW, to serve as "chairman of bingo operations" in Triana, and to earn the not-too-Princely sum of $17 a day for looking in on the gaming operations and greeting customers.[56] Sepanski was instructed that he was to greet customers and answer questions by advising that the Texas VFW was operating the bingo facility in Triana.[57]  Although Sepanski had no connection with the State of Texas, the offer allegedly was appealing to him because he could "go and come on [his] own time, one day a month or however."[58]  Sepanski joined the Texas VFW as a "member-at-large" and became the Triana "bingo chairman" and host in the fall of 2007.[59]  He was the first person residing outside the State of Texas who was allowed to become a "member-at-large" of that State's VFW organization.[60]

The corporate representative of the Texas VFW testified that Sepanski was considered to be the on-site person in charge of the Triana gaming operations.[61]

---

[55] *See id.*

[56] *See id.* at 13-15, Exhibit 5 (Letter to Sepanski from Texas VFW) .

[57] *See id.* at 37.

[58] *Id.* at 17.

[59] *See* Deposition of Lawrence O. Sepanski, at 10-11, 13, 48-49, Exhibit 5 (Letter to Sepanski from Texas VFW).

[60] *See* Deposition of Kenneth R. Burton, Jr., at 19-20.

[61] *See id.* at 114.

According to Sepanski's own testimony, however, Gomez was the person who put the deal together,[62] and Sepanski considered Gomez to be in charge of all operations.[63] Sepanski also had not been involved in obtaining bingo licenses for the operations;[64] it was not his "business" to talk to Gomez about any payments made to Gomez;[65] Sepanski did not know where the gaming operations were to be conducted until he was shown the facility by Gomez and Gibbs;[66] Sepanski was not involved in pulling or tracking any money related to the operations;[67] and, the actual games at the Triana facility were played electronically, within an electronic server that Sepanski did not access.[68] Finally, and tellingly, Sepanski received payments totaling only $170 for ten visits to the Triana gaming operations in 2007.[69]

Aside from Sepanski, the only other alleged member of the Texas VFW who was involved in the Triana gaming operation was Kymberlee Bradley, who, it is significant to note, also is the wife of Bernie Gomez.[70] Burton suggested that Bradley

---

[62] *See* Deposition of Lawrence O. Sepanski, at 30.

[63] *See id.* at 42.

[64] *See id.* at 31.

[65] *See id.* at 37.

[66] *See id.* at 34.

[67] *See id.* at 48-49.

[68] *See* Deposition of Lawrence O. Sepanski, at 38-39.

[69] *See id.* at 24-25, 57, Exhibit 4 (Itemized list for Texas VFW Check 12147).

[70] *See* Deposition of Kenneth R. Burton, Jr., at 110, 188. The relationship status between Bradley and Gomez is somewhat uncertain. Burton and Bradley both considered the relationship to be that of a marriage, while Gomez indicates that she is Gomez's long-time girlfriend. The dispute

join the ladies auxiliary of the Texas VFW, for which she was eligible due to her father's service in the Vietnam War.[71] Her only connection to the Texas VFW "was the fact that Texas VFW wanted her to be involved in the operation of the bingo game in Triana that her husband was going to be running."[72] Bradley testified that: she knew nothing about any of the vendors supplying goods or services to the Triana operations;[73] she had no knowledge of what numbers on the gaming machines meant;[74] she had no judgment as to how much money was withdrawn from the gaming machines;[75] she did not know whether records were kept of persons who won more than $1,000;[76] she had no knowledge of who made decisions about opening the facilities;[77] she did not know the parameters for determining what constitutes a bingo session;[78] she did not know how machines might be assigned to particular

---

is immaterial. *See id.* at 189-90; doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex B (Deposition of Kymberlee Roxann Bradley), at 13; Deposition of Bernard Gomez, at 10.

[71] *See* Deposition of Kenneth R. Burton, Jr., at 189.

[72] *See id.* at 189-90.

[73] Bradley originally asserted her Fifth Amendment privilege against self incrimination in response to multiple questions posed to her during deposition. Pursuant to an order entered by this court, however, Bradley supplemented her testimony with responses to written deposition questions. Citations to those responses are to the number of the question and response, preceded by "Q." *See* Deposition of Kymberlee Roxann Bradley, at Q. 72-122.

[74] *See id.* at Q. 119-25.

[75] *See id.* at Q. 142.

[76] *See id.* at Q. 146.

[77] *See id.* at Q. 153.

[78] *See id.* at Q. 155-56.

15

participating charities;[79] she had no judgment as to the amount of money generated by operations in 2007;[80] she did not know whether records were kept of any transactions related to the operations, or who would have kept them;[81] and, she played no role in obtaining licenses related to the bingo facility.[82]

The Triana gaming operation opened during October of 2007.[83]  Within just a matter of days, Burton declared the operation to be successful:  "in the black," and "paying for . . . startup expenses."[84]  The operation was so successful, in fact, that the weekend after opening, it was moved to a new location within Triana, for the purpose of multiplying the number of electronic bingo machines available for play from 60 to 200 consoles.[85]  The new facility was located at 511 Sixth Street.[86]  Gomez negotiated the lease for the new location, paid $15,000 in rent, moved the gaming equipment, and paid for necessary electrical connections.[87]  Gomez testified that he was not reimbursed by the Texas VFW for any of these relocation expenses.[88]  Even

---

[79] *See* Deposition of Kymberlee Roxann Bradley, at Q. 160.

[80] *See id.* at Q. 182.

[81] *See id.* at Q. 186-87.

[82] *See id.* at Q. 189.

[83] *See* Deposition of Bernard Gomez, at 62.

[84] *See id.* Deposition of Kenneth R. Burton, Jr., at 207-08, Exhibit 40.

[85] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 154-55.

[86] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 7 (Deposition of Sergeant Salomonsky), at 28.

[87] *See* Deposition of Bernard Gomez, at 70, 77.

[88] *See id.*

16

so, the lease for the new location was in the name of the Texas VFW, and required

rental payments of $25,000 a month.[89]  Texas VFW began operating electronic games

at the new location in November of 2007.[90]

## A.   Plaintiff's Electronic Bingo Games

All of the electronic games within the Triana VFW facility during November

of 2007 were manufactured and distributed by Nova Gaming, LLC ("Nova").[91]

Nova's individual bingo consoles were connected to a central computer server that

controlled the entire gaming system.[92]  Bingo cards appeared on the individual

consoles,[93] but players could change the way the video screen appeared from a view

of a bingo card only, to a "reel view," which showed reels in the center of the screen

and a bingo card at the bottom left.[94]  Once the game began, the server randomly

generated numbers for the game.[95]  A win occurred if the randomly selected numbers

matched, in number and pattern, a grid of numbers assigned to a particular terminal.[96]

---

[89] *See* Deposition of Kenneth R. Burton, Jr., at 143-45, Exhibit 51.

[90] *See* Deposition of Sergeant Salomonsky, at 28.

[91] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 8 (Field/Property Evidence Form); *see also* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 101.

[92] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 31, 177.

[93] *See id.* at 6, 35, 40, 44.

[94] *See id.* at 44-45.

[95] *See id.* at 33, 36, 38, 39.

[96] *See id.* at 33-39.

17

The server continued to select numbers until all of the numbers on the numbered grid assigned to a particular console had been selected, at which point a "session" ended and a new "session" began.[97]  All of the machines paid winnings for intermediate winning patterns during a session, in addition to the final session-ending cover-all pattern.[98]  There were multiple potential winning patterns within any given session, with each different pattern paying a different winning amount.[99]  The "jackpot" for a particular session could be paid either for the session-ending cover-all pattern or some interim winning pattern.[100]

Nova anticipated that "hundreds of charities" would participate in the Triana gaming operation supported by its system.[101]  Because Nova believed that each participating charity could pay $1,000 in winnings during each bingo session, the manufacturer allegedly thought that it was impossible to actually exceed the legal limitations for the amount of winnings paid by bingo operations in Madison County, Alabama.[102]  Accordingly, Nova made no alterations to its gaming system in order to ensure compliance with legal limitations imposed by Alabama law.[103]

---

[97] *See id.* at 56-57, 61.

[98] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 68, 184.

[99] *See id.*, at 48.

[100] *See id.* at 68.

[101] *See id.* at 163-64.

[102] *See id.*

[103] *See id.*

18

Although Nova anticipated that it would run hundreds of sessions for hundreds of charities at the Triana facility in any 24-hour period, only twenty to twenty-five alleged charities purportedly participated in the bingo operations.[104]  These charities included the various Texas VFW posts, as discussed above, and other non-VFW related charities, such as the "Triana Historical Society" and the "Ralph David Abernathy, III Foundation."[105]  Individual consoles were not assigned to particular charities, and the  participation and/or division of play between the charities was an accounting function that could not be observed or perceived by players.[106]

The gaming machines were programmed to pay back a certain average percentage of monies bet.[107]  For example, a "Beach Vacation" game was set to pay back 93% of monies played.[108]  Electronic displays on the gaming consoles advertised jackpot prize amounts ranging from a few hundred dollars to more than $10,000.[109]  Nova alleges that the dollar signs on these displays were a facade only, and that such advertised jackpots may not have actually been available.[110]  But

---

[104] *See* Deposition of Sharron Humphrey, at Exhibit 17; Deposition of Bernard Gomez, at 58, 118.

[105] *See id.*

[106] *See* Deposition of Bernard Gomez, at 114-17.

[107] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 78.

[108] *See id.*

[109] *See id.* at 186-96; *see* Deposition of Sergeant Michael Salomonsky, at Exhibit 10 (photographs), 59-61.

[110] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 186-96.

Sepanski, the Texas VFW "bingo chairman," testified that available jackpots varied from hundreds to thousands of dollars.[111]  Gomez was aware of players who received prizes of $1,500 to $2,000.[112]  The gaming operations paid out substantially in excess of $2,000 in prize money in a single day of operation.[113]

## B.   Events That Precipitated This Action

Sergeant Michael Salomonsky of the Madison County Sheriff's Department visited the VFW facility located at 511 Sixth Street in Triana, Alabama, on November 3, 2007.[114]  He observed the VFW's operations for about thirty minutes,[115] and then requested and received a warrant to search the facility and confiscate all of the electronic games.[116]  Later that same day, Sgt. Salomonsky executed the warrant and seized 200 electronic bingo machines.[117]  The aggregate value of the seized machines allegedly exceeds $2 Million Dollars.[118] Criminal charges were instituted in the District Court of Madison County against Gomez and Bradley for violations of

---

[111] *See* Deposition of Lawrence O. Sepanski, at 40-41.

[112] *See* Deposition of Bernard Gomez, at 65.

[113] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 84, 129-31, Exhibit 5.

[114] *See* Deposition of Sergeant Michael Salomonsky, at 32, 48.

[115] *See id.* at 98.

[116] *See id.* at 32, 69.

[117] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 8 (Nov. 3, 2007 Field Property/Evidence Form); Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 101.

[118] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 106.

Alabama Code §§ 13A-12-22 and 13A-12-27.

In February 2008, after the commencement of this litigation, plaintiff resumed operations, using electronic bingo games manufactured by Gateway Gaming, LLC that were comparable to the Nova machines seized in November of 2007.[119]  The operations continued until March 2008, when the defendant again acted, seizing the Gateway Gaming machines.[120]

### III.  ALABAMA'S PROHIBITION OF LOTTERIES

The Alabama Constitution prohibits lotteries in the following language:

> The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this State, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided.

Ala. Const. art. IV, § 65 (1901).[121]  Historically, this provision has been construed expansively.  *See*, *e.g.*, *Opinion of the Justices No. 277*, 397 So. 2d 546, 547 (Ala. 1981) ("[T]he courts have shown a general disposition to bring within the term 'lottery' every species of gaming, involving a disposition of prizes by lot or chance,

---

[119] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 15 (Declaration of Michael Caldwell), ¶ 33.

[120] *See* Deposition of Sergeant Michael Salomonsky, at 113.

[121] The Alabama Supreme Court has said that the intent of this constitutional provision is the prevention of "corruption and immorality."  *Opinion of the Justices No.373*, 795 So. 2d 630, 633 (Ala. 2001) (citing *State v. Shugart*, 138 Ala. 86, 35 So. 28 (1903); *State v. Crayton*, 344 So. 2d 771 (Ala. Civ. App. 1977)).

. . . which comes within the mischief to be remedied — regarding always the substance and not the semblance of things, so as to prevent evasions of the law.") (citation and internal quotation marks omitted).[122]

The Alabama Supreme Court provided a succinct definition of the term "lottery" in *Grimes v. State*, 235 Ala. 192, 178 So. 73 (1938), holding that it is: "(1) a prize, (2) awarded by chance, (3) for a consideration." *Id*. at 193, 178 So. at 74; *see also Opinion of the Justices No.373*, 795 So. 2d 630, 635 (Ala. 2001) (observing that *Grimes*' three-pronged definition "is still accepted by the overwhelming majority of jurisdictions, as well as the United States Supreme Court").

The most important element of the definition of a lottery is the component of "chance," as contrasted to a player's skill, knowledge, or intelligence.  *See*, *e.g.*, *Opinion of the Justices No. 83*, 249 Ala. 516, 524, 31 So.2d 753, 761 (1947) ("In a lottery, . . . chance is *the determining factor* and a participant has no opportunity to *materially* exercise his reason.") (emphasis supplied).   Conversely, a contested scheme or game is not a lottery where "a *significant* degree of skill is involved." *Opinion of the Justices No. 205*, 287 Ala. 334, 335, 251 So. 2d 751, 753 (1971) (emphasis added).  In summary, "where the *dominant* factor in a participant's failure

---

[122] The mere fact — as discussed in Part III(C)(1) of this opinion, *infra* — "that it was necessary to amend the Constitution to except 'bingo' from § 65's blanket prohibition on lotteries also demonstrates the broad construction that section has been given."  *Opinion of the Justices No. 373*, 795 So. 2d at 640.

or success in any particular game or scheme is chance, the scheme is a lottery —

despite the use of some degree of judgment or skill." *Opinion of the Justices No. 373*,

795 So. 2d at 641 (emphasis in original).

"In this State, therefore, the public policy is emphatically declared against

lotteries, *or any scheme in the nature of a lottery*." *Try-Me Bottling Co. v. State*, 235

Ala. 207, 212, 178 So. 231, 234 (1903) (emphasis supplied); *see also*, *e.g.*, *Opinion

of the Justices No.373*, 795 So. 2d at 638 (observing that the Alabama constitutional

ban on lotteries "includes prohibitions against 'gift enterprises' and 'any scheme in

the nature of a lottery.'"); *id.* at 640 (same).   The Alabama Supreme Court later

observed that its opinion in the *Try-Me Bottling* case

> expressly called attention to the broad conception set forth in § 65
> showing that the prohibition is not only against lotteries but also against
> any scheme in the nature of a lottery.  *The very purpose of this broad
> declaration was to put a ban on any effort at evasion or subterfuge*.
> Whatever may be the view of the courts of other states on the subject of
> lotteries, *these cases show that this court has adopted a broad view of
> the meaning of the constitutional provision which does not admit of
> quibbling or narrow construction*.

*Opinion of the Justices No. 83*, 249 Ala. 516, 518, 31 So. 2d 753, 755 (1947)

(emphasis supplied).

## A.    The Statutory Overlay

In accordance with the constitutional mandate discussed above, the Alabama

23

Legislature has adopted a number of statutes prohibiting "lotteries" and any scheme in the nature of a lottery in which "chance" is the dominant factor in determining the result of the game.  *See* Ala. Code §§ 13A-12-20 through 13A-12-92 (1975) (2005 Replacement Vol.).

The most relevant statutes for present purposes are § 13A-12-22, which makes the promotion of gambling a Class A misdemeanor,[123] and § 13A-12-27, which declares the possession of a gambling device or a slot machine to be a Class A misdemeanor.[124]  The terms central to an understanding of those provisions — "gambling," "gambling device," and "slot machine" — are defined in various sub-sections of § 13A-12-20.  For example, "gambling" is defined as follows:

---

[123] Ala. Code § 13A-12-22 provides that:  "(a) A person commits the crime of promoting gambling if he knowingly advances or profits from unlawful gambling activity otherwise than as a player.  (b) Promoting gambling is a Class A misdemeanor."

[124] This statute provides that:

(a) A person commits the crime of possession of a gambling device if with knowledge of the character thereof he manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of:

(1) A slot machine; or

(2) Any other gambling device, with the intention that it be used in the advancement of unlawful gambling activity.

(b) Possession of a gambling device is a Class A misdemeanor.

Ala. Code § 13A-12-27 (1975) (2005 Replacement Vol.).

24

> A person engages in gambling if he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome.

Ala. Code § 13A-12-20(4).  A "gambling device" is:

> Any device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine.  However, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices within this definition.

Ala. Code § 13A-12-20(5).  A "slot machine" is a form of a "gambling device" that,

> as a result of the insertion of a coin or other object, operates, either completely, automatically, or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. . . .

Ala. Code § 13A-12-20(10).  *See also*, *e.g.*, *Johnson v. State*, 137 Ala. 101, 104, 34

So. 1018, 1019 (1903) (declaring a slot machine to be a lottery); *Loiseau v. State*, 114

Ala. 34, 36, 22 So. 138, 139 (1897) (holding that a slot machine is a lottery).

## B.    The Ordinary Game of Bingo Is A Prohibited Lottery

The Supreme Court of Alabama has declared the ordinary game of bingo to be

a "lottery" that is prohibited by the State's constitution.  *See*, *e.g.*, *City of Piedmont*

*v. Evans*, 642 So. 2d 435, 436-37 (Ala. 1994) ("The parties have stipulated and the

25

Court finds, that 'bingo' is a lottery."); *Barrett v. State*, 705 So. 2d 529, 531 n.2 (Ala. Crim. App. 1996) (holding that "bingo is a type of lottery").

**1**.      *Constitutional amendments permitting bingo in certain localities*

Even so, the Alabama Constitution has been amended sixteen times by amendments that apply only to specific areas of the State — *i.e.*, fifteen counties, and one municipality within one of those counties — creating exceptions to the prohibition on lotteries stated in Article IV, § 65 of the 1901 state constitution, and allowing the game of bingo to be played in those areas under certain circumstances. *See* Ala. Const. amends. 386 (Jefferson County), 387 (Madison County), 413 (Montgomery County), 440 (Mobile County), 506 (Etowah County), 508 (Calhoun County), 542 (St. Clair County), 549 (Walker County), 550 (The City of Jasper, in Walker County), 565 (Covington County), 569 (Houston County), 599 (Morgan County), 612 (Russell County), 692 (Limestone County), 743 (Greene County), and 744 (Macon County).

**a**.      *Amendment No. 387, pertaining to Madison County*

The Alabama constitutional amendment relevant to the issues of the present action is number 387, which limits the otherwise absolute prohibition upon lotteries and allows the game of bingo to be played in Madison County under the following circumstances:

26

The operation of bingo games for prizes or money by nonprofit organizations for charitable or educational purposes shall be legal in Madison county, subject to the provisions of any resolution or ordinance by the county governing body or the governing bodies of the respective cities and towns, within their respective jurisdictions.   The said governing bodies shall have the authority to promulgate rules and regulations for the licensing and operation of bingo games, within their respective jurisdictions, *provided*, *however*, *that said governing bodies must insure compliance with the following provisions*:

(a) No person under the age of 19 shall be permitted to play any game or games of bingo, nor shall any person under the age of 19 be permitted to conduct or assist in the conduct of any game of bingo;

(b) No bingo license shall be issued to any nonprofit organization, unless such organization shall have been in existence for at least 23 months immediately prior to the issuance of the license;

(c) Bingo games shall be operated only on the premises owned or leased by the nonprofit organization operating the bingo game. If the premises is leased, the rate of rental shall not be based on a percentage of receipts or profits resulting from the operation of bingo games;

(d) No nonprofit organization shall enter into any contract with any individual, firm, association or corporation to have said individual or entity operate bingo games or concessions on behalf of the nonprofit organization, nor shall said nonprofit organization pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game;

(e) A nonprofit organization shall not lend its name or allow its identity to be used by any other person or entity in the operating or advertising of a bingo game in which said nonprofit organization is not directly and solely operating said bingo game;

(f) Prizes given by any nonprofit organization for the playing of bingo games shall not exceed $1,000.00 in cash or gifts of equivalent

27

value during any bingo session or $2,000.00 in cash or gifts of equivalent value during any calendar week;

(g) No person or organization, by whatever name or composition thereof, shall take any salary, expense money, or fees as remuneration for services rendered in the operation of any bingo game.

Ala. Const. amend. 387 (1980) (emphasis supplied).

**b**.    *Town of Triana Ordinance No. 2006-05*

In an effort to act in accordance with the authority granted by the foregoing amendment, the Town of Triana adopted Ordinance No. 2006-05 on October 9, 2006, and thereby attempted to authorize the operation of bingo games within its corporate limits, subject to requirements that will be discussed *infra*, in Part IV(E) of this opinion.

## IV.  DISCUSSION

The pivotal issue in this litigation is the question of whether plaintiff's electronic bingo games comply with Amendment No. 387 to the Alabama Constitution.  Unless an allegedly legal bingo operation strictly complies with all of the requirements of that Amendment, the operation constitutes illegal gambling under the constitutional, statutory, and judicial authorities discussed above.

Rather than demonstrate its compliance with the requirements of Amendment 387, however, plaintiff argues as a basis for entry of partial summary judgment in its

28

favor that its electronic bingo machines should not be considered "gambling devices" or "slot machines" within the meaning of those statutory provisions discussed in Part III(A) above.[125]  Plaintiff further asserts that its electronic bingo machines:  comply with the legality criteria specified by the Alabama Attorney General in a December 2004 press release; comply with the bingo ordinance adopted by the Town of Triana; and, qualify as "Class II" games under the Indian Gaming and Regulatory Act, 25 U.S.C. § 2701.[126]  Each of these contentions will be addressed in turn, before reaching the dispositive issue of plaintiff's compliance with Amendment 387.

## A.    Gambling Device

Plaintiff argues that its electronic bingo machines do not fit the definition of a "gambling device" under Alabama law and, therefore, that the games played upon its machines are legal.[127]  Plaintiff focuses upon the last sentence of the statutory definition of a "gambling device," which excludes "lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes":

> Any device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that

---

[125] *See* doc. no. 75 (Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 3.

[126] *See* doc. no. 60 (Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 19-25.

[127] *See* doc. no. 75 (Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 3.

> activity consists of gambling between persons or gambling by a person involving the playing of a machine. *However, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices within this definition.*

Ala. Code § 13A-12-20(5) (emphasis added). As discussed above, in Part III(B) of this opinion, the ordinary game of bingo has been declared to be a prohibited lottery under Alabama law. Plaintiff accordingly argues that its electronic bingo machines should be construed as "other items used in the playing phases of lottery."[128] At first blush, plaintiff's broad interpretation appears plausible, but only if the language is read in a vacuum. A closer look at the statutory scheme compels the conclusion that plaintiff's argument is without merit.

In essence, plaintiff urges the court to adopt the view that any machine used in the operation of a lottery, including the variant called "bingo," cannot fall under the definition of a "gambling device" found in Alabama Code § 13A-12-20(5).[129] Such

---

[128] *See id.*

[129] In support of this argument, plaintiff cites the decision of the New York Supreme Court, Appellate Division, in *Dalton v. Pataki*, 780 N.Y.S.2d 47 (N.Y. App. Div. 2004), holding that video lottery machines linked together electronically are "items" used in the playing phase of a lottery scheme and therefore do not meet the definition of an illegal "slot machine" under New York Penal Law. *See* doc. no. 75 (Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 3-4. Because the statutory scheme at issue in *Dalton* is distinguishable from the relevant Alabama law in this case, plaintiff's reliance on *Dalton* is misplaced. Unlike the Alabama Constitution, the New York Constitution allows "lotteries" as long as they meet certain requirements. Accordingly, the penal law that exempts "items used in the playing phases of a lottery scheme" from the definition of a gambling device may fairly be read to include the video lottery machines at issue in that case. But in Alabama, lotteries are generally prohibited by section 65 of the Alabama Constitution and Alabama Criminal Code § 13A-12-20 *et*

30

a construction would negate the purpose behind the entire statutory scheme — to prohibit the possession of devices used for gambling. If the last sentence of Alabama Code § 13A-12-20(5) is read in context, the meaning of "lottery tickets, policy slips and other items used in the playing phases of lottery" becomes more clear.  These "other items" that may be used by a player as part of his or her participation in the "playing phases" of a "lottery" must be separate  from the operation of the lottery itself.  The following example illustrates the point:  a unique token made for the purpose of playing an electronic gambling machine arguably would be like a lottery ticket, insofar as it is an "item used in the playing phases of the lottery," but separate from the lottery itself.  Thus, like a cardstock or paper lottery *ticket*, the token arguably would be excluded from the definition of a "gambling device" found in Alabama Code § 13A-12-20(5).  Even so, the machine into which the token is inserted still would constitute a "gambling device" — and maybe even the "slot machine" sub-specie defined by § 13A-12-20(10) — because the machine is inseparable from the game of chance that takes place within.  To find otherwise would defeat the purpose of the statutory structure enacted for the purpose of enforcing the state's constitutional prohibition on lotteries and other prohibited forms

---

*seq*.  Therefore, a video lottery machine would not be exempt from the definition of a gambling device under Alabama law.  The only type of lottery that is legal in Alabama is a game of "bingo" that meets all of the requirements of an applicable constitutional amendment.

31

of gambling.

For these reasons, plaintiff's argument that its electronic bingo machine should be excluded from the definition of a "gambling device" must fail.  Both the actual computer server and the individual bingo gaming consoles (or computer monitors) operated by individual players are necessary to, and inseparable from, the game of chance that takes place within their software and electronic circuitry.

**B**.   **Attorney General's Press Release**

Plaintiff also contends that its electronic bingo machines are legal because their operational features comply with criteria specified in the following press release promulgated by Alabama Attorney General Troy King on December 1, 2004:[130]

> (MONTGOMERY) — Attorney General Troy King today announced the findings from his unprecedented, hands-on evaluation and review of gambling occurring in Alabama.  The review was initiated as a result of complaints received from individuals and groups and began on July 2 with the first of several tours of gambling facilities in the state.  The Attorney General made public his findings today "because I have now completed my initial review of gambling in Alabama.  In the future, as in the past, so long as gambling occurs in Alabama, my review can never be complete."
>
> \* \* \* \*

---

[130] *See* doc. no. 60 (Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 21-24.

Bingo has evolved from its origins hundreds of years ago to cards where the numbers are covered by buttons or other markers, to sheets of paper where the numbers are daubed with a a paint pen, to laptop computer-like devices where multiple cards can be played simultaneously, to video consoles where the bingo game is simulated with computer chips.  It is machines of this final sort that are most prominently on display at [the racetrack facilities known as] Greenetrack and Victoryland [which are located in Greene and Macon Counties, respectively] and which have been the focus of much of the controversy in Alabama surrounding the legality of these operations.

The games played on these video consoles must have certain important features to be bingo:  First, the game must incorporate the typical features of traditional bingo, including, but not limited to, a grid of five vertical squares, numbers randomly selected, and a preordained winning pattern.  Spinning wheels and other video graphics must not affect game play.  Second, just as in traditional bingo halls, players on the machines must compete against one another.  Consequently, the electronic machines must be linked so that players are competing against each other to permit the machines to comply with the constitutional requirement of "bingo."  For example, such a machine might depict a bingo card in the upper left hand corner of the machine, and as the game play commences, balls containing numbers begin to fall.  When a number depicted on the card is dropped, it would be marked on the cards of those playing and players would win prizes in the same manner that they win prizes in traditional bingo halls.  If the machines at any facility should ever be determined  to be operating for single participants, then those facilities would be operating outside the bounds of the constitutional grant and would be subject to the appropriate legal action.

It cannot be concluded, as some have, that just because the game is being played on video consoles, it is not "bingo."  Just as no one would contend that e-mails are any less a form of correspondence than are letters written with a quill pen, but instead represent a technological evolution in correspondence, similarly, bingo games that are depicted on a video console can still be bingo — albeit a technologically advanced

form of bingo — but bingo nonetheless.

>Attorney General King's conclusion is that, as a matter of law, machines that operate in the manner described above are permissible under the broad language of Amendment 743 relating to Greene County and Amendment 744 relating to Macon County.  Attorney General King warned that "under no circumstances, however, should anyone construe my comments here today to mean that Class III gaming, as defined under the Indian Gaming Regulatory Act, is permissible in the state of Alabama.  Machines that do not operate as I have described are not bingo and violate state law."  . . .

Press Release, *A.G. King Announces Findings of His Gambling Review* (Dec. 1, 2004), at 1-3.[131]  This document is not authority upon which summary judgment may be granted or denied.

The powers and duties of the Attorney General of the State of Alabama are generally set forth in Article V, sections 116 and 137 of the Alabama Constitution, and Chapter 15 of Title 36 of the 1975 Code of Alabama.  These governing laws do not authorize the Attorney General of the State of Alabama to legalize otherwise illegal activity, or to declare any particular activity to be legal.  The Attorney General is authorized by Alabama Code § 36-15-1(1) (1975) (2001 Replacement Vol.) to issue certain official written opinions, but the Alabama Code and Constitution are silent with respect to the authority of the Attorney General to issue an opinion in the form

---

[131] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), Ex. 3 (News Release).

of a  press release.  Even written opinions of the Attorney General issued in accordance with Alabama Code § 36-15-1(1) are not binding statements of law, but merely advisory, and do not have the effect of law.  *See* Ala. Code § 35-15-19 (stating that the Attorney General's written opinions operate only to protect the county or municipal officials to whom it is directed from liability for any official acts performed as directed or advised in the opinion); *see also*, *e.g.*, *Broadfoot v. State*, 28 Ala. App. 260, 182 So. 411 182 So. 411, 412 (Ala. Civ. App. 1938) (same).

Further, the press release does not address Amendment 387, or the effect of a gaming operation's failure to comply with specific constitutional requirements for operation by a charity.  As a consequence, the Attorney General's press release does not merit further discussion.

## C.   Town of Triana Ordinance

Plaintiff also argues that its bingo games are legal because the manner in which they are conducted complies with the terms of an ordinance enacted by the Town of Triana.[132]  Specific aspects of that ordinance will be discussed *infra*, in Part IV(E) of this opinion, but for now it need only be noticed that the Alabama Court of Criminal Appeals considered and rejected a similar argument in two cases, both holding that

---

[132] *See* doc. no. 60 (Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 20-24.

that the narrow parameters set out in a constitutional amendment permitting bingo games to be conducted within a particular Alabama county may not be broadened by a municipal ordinance. *See Foster v. State*, 705 So. 2d 534, 537-38 (Ala. Crim. App. 1997); *Barrett v. State*, 705 So. 2d 529, 532 (Ala. Crim. App. 1996). Both cases arose out of the playing of a game known as "U-Pick-Em" — a variation of the ordinary game of bingo — at the "Frontier Palace" in the City of Piedmont, Calhoun County, Alabama.

The defendant in *Foster* was the owner and manager of the Frontier Palace, while the defendant in *Barrett* was the floor manager of that facility. Both men had been arrested for and subsequently convicted of promoting gambling and possession of gambling devices. *See Foster*, 705 So. 2d at 536; *Barrett*, 705 So. 2d at 530. Both argued on appeal that "U-Pick-Em" was a legal game, because the manner in which it was played[133] complied with the definition of "bingo" contained in an ordinance

---

[133] The game of "U-Pick-Em" was played in the following manner at the Frontier Palace in Piedmont, Alabama:

Each player pays one dollar for each chance to win. In exchange the player is given a card containing the numbers 1 through 75. For two dollars a player gets two cards; three dollars, three cards, etc. The player then chooses eight numbers on each card and gives the cards over to a computer operator who feeds the numbers into a computer. In the alternative, the player can elect to let the computer automatically choose the eight numbers per card. Regardless of which method is selected, the computer prints a slip of paper containing the eight numbers and that paper is given to the player. The slip of paper contains rows of numbers which correspond to the numbers selected. If the player paid one dollar the paper contains one row of eight numbers; two dollars results in two rows of eight numbers; etc. Depending on the

36

adopted by the City of Piedmont,[134] pursuant to Amendment No. 508, which legalized

bingo in Calhoun County.[135]

---

> number between 1 and 75 chosen, the numbers have a letter attached to them.  The
> letter is a "B," "I," "N," "G," or "O," depending on where the number would fall on
> a common bingo card.  After each player has the slip of paper, the actual playing
> commences.  An announcer calls out 20 numbers; if any player matches each of eight
> numbers in any given row, that player wins the grand prize.  If no one matches all
> eight numbers during the first 20 calls, the announcer continues to call numbers until
> the first person to match eight numbers in one row calls bingo.  If the winner does not
> match within the first 20 numbers, the prize is called a consolation prize and is very
> small when compared to the grand prize.  Additionally, if no one wins the grand
> prize, that prize is increased and carried forward to another night.  The record shows
> that on the nights that the investigators were present the potential grand prize
> exceeded $10,000 while the consolation prize was $100.

*Barrett v. State*, 705 So. 2d 529, 531 (Ala. Crim. App. 1996); *see also Foster v. State*, 705 So. 2d
534, 537 (Ala. Crim. App. 1997).

[134] The Ordinance defined the term "bingo" as follows:

> Bingo.  That specific kind of game, or enterprise, commonly known as
> "bingo," in which prizes are awarded on the basis of designated numbers, or symbols,
> which are drawn, at random, by the operator of said game and which are placed by
> the persons playing, or participating in said game, on cards, or sheets or paper, which
> contain, or set out, numbered spaces, upon which said designated numbers, or
> symbols, may be placed by the persons playing or participating in said game.

*Foster*, 705 So. 2d at 537 (quoting City of Piedmont Ordinance No. 429, § II); *see also Barrett*, 705
So. 2d at 531 (same).  The *Foster* Court noted that a sub-section of the same ordinance also provided
that:

> (a)  Any qualified non-profit organization, as herein defined, may operate and
> conduct, "bingo" games as herein defined, within this city, and its police jurisdiction,
> for prizes, or money, for charitable or educational purposes, to the extent and in the
> manner authorized by the provisions hereof and in accordance with Amendment 508,
> of the Constitution of Alabama, 1901.

*Foster*, 705 So. 2d at 537 (quoting City of Piedmont Ordinance No. 429, § II(a)).

[135] The constitutional amendment of local application to Calhoun County, and municipalities
within that county, is identical to the amendment affecting Madison County in all respects except
this:  *i.e.*, the Calhoun County amendment contains a concluding paragraph providing that "[t]he

The Alabama Court of Criminal Appeals rejected those arguments, and affirmed the defendant-appellants' convictions in each case. The Court's opinions rest upon three principles that relate to one another like the parts of a syllogism. The basic premise was that constitutional amendments permitting the game of "bingo" to be played in certain Alabama localities — such as the amendment applying to Calhoun County that was addressed in *Foster* and *Barrett*, or the amendment applying to Madison County at issue in the present action — create "only a narrow exception to the . . . clear public policy against lotteries" expressed in the Alabama Constitution. *Barrett*, 705 So. 2d at 531.[136] The minor premise of the court's opinions was that

provisions of this amendment shall be self-executing, but the legislature shall have the right and power by general, special or local act to adopt laws supplemental to this amendment or in furtherance of the general purposes and objectives herein set forth." *Compare* Ala. Const. amend. 387 (1980) (Madison County) *with* amend. 508 (1990) (Calhoun County).

[136] As discussed earlier in this opinion, Article IV, § 65 of the 1901 Alabama Constitution states that:

> The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided.

In *City of Piedmont v. Evans*, 642 So. 2d 435 (Ala. 1994), the Alabama Supreme Court was asked to determine whether Amendment No. 508 — which permits the game of bingo to be played in Calhoun County under certain circumstances — repealed the public policy against lotteries and other games of chance incorporated in Article IV, § 65 of the state constitution, at least within the jurisdiction of Calhoun County. The Court answered that question in the negative, saying:

> Amendment No. 508 to the Constitution of Alabama did not repeal Article IV, § 65, of the Constitution of Alabama. Amendment No. 508 simply amended the

38

municipal ordinances adopted pursuant to such constitutional amendments — like that of the City of Piedmont in *Foster* and *Barrett*, or the Town of Triana in the present action — "must be construed in harmony with this state's strong public policy against lotteries as expressed in § 65 of the Alabama Constitution." *Foster*, 705 So. 2d at 537 (quoting *Barrett*, 705 So. 2d at 531-32).  The conclusion that followed from these premises, therefore, was that the City of Piedmont — or, by extension, a town like Triana — could not adopt

> an ordinance that broadens the scope of the narrow exception to the prohibition of lotteries in the Alabama Constitution.  *see City of Piedmont v. Evans*, 642 So. 2d 435 (Ala. 1994); § 11-45-1, Code of Alabama 1975 (municipal ordinances must be consistent with state law).  Construing the ordinance as a whole in harmony with strongly expressed public policy, we hold that no expression in the ordinance can be construed to include anything other than the ordinary game of bingo.

*Foster*, 705 So. 2d at 537-38 (quoting *Barrett*, 705 So. 2d at 532).[137]

---

> Constitution of Alabama by allowing the lottery of "bingo" to be operated legally in Calhoun County for prizes or money by certain non-profit organizations for charitable, educational, or other lawful purposes.  The only lottery legalized by the passage and ratification of Amendment No. 508 was and is the lottery of "bingo."

*Evans*, 642 So. 2d at 436 (quoting trial court order) (internal quotation marks omitted).

[137] Applying the principles discussed in text to the manner in which "U-Pick-Em" was played, *see supra* note 133, the opinions of the Alabama Court of Criminal Appeals in *Foster* and *Barrett* affirmed each appellant's trial court convictions for promoting gambling and possession of gambling devices, in violation of Ala. Code §§ 13A-12-22 and 13A-12-27 (1975).

> The game described above is clearly not the game "commonly known as bingo."  On the contrary, we agree with the statements by an employee of the Palace and also by the appellant himself, when asked by an investigator how to play the

Amendment No. 387 requires all municipalities within Madison County to "insure compliance" with the requirements of that Amendment.  Those requirements cannot be *either* broadened *or* negated by a municipal ordinance.  Therefore, even if plaintiff can show that its electronic games comply with the definition of "bingo" contained in Town of Triana Ordinance No. 2006-05, plaintiff still must demonstrate that its bingo games and operations comply with *all* of the requirements of Amendment No. 387 to the state constitution.  Failure to do so will result in the games being declared illegal.  *See*, *e.g.*, *Foster*, 705 So. 2d at 538 (observing that "a municipality's legislative authority is subordinate to the Constitution of Alabama 1901 and the provisions of the Alabama Code," and that "Cities may only adopt ordinances 'not inconsistent with the laws of the state'") (quoting Ala. Code § 11-45-1); *Congo v. State*, 409 So. 2d 475 (Ala. Crim. App. 1981) ("A municipality has the authority to enact ordinances pursuant to its police powers, *as long as the ordinances are consistent with the general laws of the state*.") (emphasis supplied).

### D.    Indian Gaming and Regulatory Act

---

game, that the game is played "like the Florida lottery."  Because lotteries, other than the common game of bingo, are illegal in Calhoun county regardless of their perpetrator's thinly veiled attempts to disguise them, the circuit court was not in error in finding that "U-Pick-Em" is an illegal lottery and that the appellant is guilty of violating §§ 13A-12-22 and 13A-12-27.

*Barrett*, 705 So. 2d at 531-32.

Plaintiff's final argument is that it is entitled to summary judgment on the legality of its bingo games because the gaming system at issue is a "Class II" game under the Indian Gaming and Regulatory Act.[138]   *See* 25 U.S.C. § 2701 *et seq.* However, that Act applies only to the conduct of gambling operations on Indian reservations, *see* 25 U.S.C. § 2710, and it is undisputed that the Triana operation at issue is not located on Indian lands.[139]   Consequently, plaintiff's argument does not merit further discussion.

### E.   Compliance With the Requirements of Amendment No. 387

Amendment 387 provides the only exception to Alabama's absolute prohibition on lotteries within Madison County.  If a gaming operation fails to satisfy any of the requirements of that amendment, the operation constitutes illegal gambling under Alabama Code § 13-A-12-20 *et seq.* — *i.e.*, it is a criminal offense that *is* enforceable by defendant.

#### 1.   *"Bingo games"*

The amendment permits the operation of "bingo games," but does not define the term.  Instead, it makes the operation of bingo games subject to the provisions of

---

[138] *See* doc. no. 60 (Plaintiff's Motion for Summary Judgment on the Legality of Bingo Games), at 24-26.

[139] *See* Deposition of Sharron Humphrey, at 254.

41

resolutions or ordinances enacted by the Madison County Commission or municipalities located within the county. The ordinance adopted by the Town of Triana pursuant to the amendment defines "bingo" as

> a specific game of *chance* . . . in which prizes or cash are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random. The definition of bingo shall include both "call bingo" in which designated numbers or symbols are drawn by a person and matched to numbers of [*sic*] symbols on a paper card and "electronic bingo" in which the numbers or symbols are selected at random by a computer and the card is present only in an electronic format. In the event of any controversy concerning whether or not certain activity, or type of activity constitutes the game of "bingo", as herein defined, and for which a license may be issued, the decision of the Town Council shall control, and shall be final.

Town of Triana Ordinance No. 2006-05, § 1 (emphasis supplied).

As discussed above, in Part IV(C) of this opinion, the Alabama Court of Criminal Appeals construed a similar ordinance enacted by the City of Piedmont in *Barrett v. State*, *supra*, which defined the term "bingo" as:

> that specific kind of game, or enterprise, commonly known as "bingo," in which prizes are awarded on the basis of designated numbers, or symbols, which are drawn, at random, by the operator of said game and which are placed by the persons playing, or participating in said game, on cards, or sheets of paper, which contain, or set out, numbered spaces, upon which said designated numbers or symbols, may be placed by the persons playing or participating in said game.

*Barrett*, 705 So. 2d at 531.  After holding that a municipal ordinance could not

expand the scope of an amendment creating a narrow exception to the constitutional

prohibition on lotteries, the *Barrett* Court wrote:

> Even a layman could not assert that the technical definition in the
> ordinance is an attempt to expand the common, ordinary definition of
> the game of bingo.  Moreover, *as a matter of law, the City of Piedmont
> could not pass an ordinance that broadens the scope of the narrow
> exception to the Alabama Constitution*.  Construing the ordinance as a
> whole in harmony with strongly expressed public policy, we hold that
> *no expression in the ordinance can be construed to include anything
> other than the ordinary game of bingo*.

*Id.* at 532*.* (citations omitted) (emphasis added).  Like the ordinance addressed in

*Barrett*, the Triana ordinance at issue in this case cannot "be construed to include

anything other than the ordinary game of bingo."

   **a**. *The ordinary game of bingo*

   The ordinary game of bingo is a game of chance that normally is played by

groups of people seated in bingo halls, school lunchrooms, church cafeterias, fire

halls, or other community spaces.  Balls bearing a combination of one of five letters

(B - I - N - G - O) *and* a number between 1 and 75 are randomly drawn, usually from

a wheel, and announced by a "caller."  The game is played on flat pieces of cardboard

or disposable paper containing 25 squares arranged in five vertical columns and five

horizontal rows (*i.e.*, a 5 x 5 square matrix).  The letters B - I - N - G - O are printed

above the five vertical columns, with one letter appearing above each column; the center space on the square matrix may be marked "Free"; and, one of the 75 numbers with which the game typically is played is pre-printed in each of the remaining 24 squares.   The distribution of these 75 numbers commonly corresponds to the following arrangement on the pre-printed card:  1 to 15 in the "B" column;  16 to 30 in the "I" column;  31 to 45 in the "N" column;  46 to 60 in the "G" column;  and, 61 to 75 in the "O" column.  As balls are randomly drawn and the marked letter/number combination announced by the caller, each player covers (with a poker chip, "daub" of paint, or some other marking device) any square on his or her Bingo card(s)[140] that correspond to the announced letter/number combination.  Players compete against each other to be the first to achieve a specified winning pattern announced by the caller before the beginning of each game (typically, five contiguous squares covered vertically, horizontally, or diagonally), and a winner is required to call out the word "Bingo!" to alert other players and the caller to a possible win.  Bingo cards are not cleared and a new game begun until it has been confirmed that each space covered on the putative winner's card was, in fact, randomly drawn and announced by the caller during the course of that game.

      **b**.   *Plaintiff's electronic bingo games*

---

[140] Players may, and often do, play more than one card at a time.

All of the electronic bingo games within the Triana VFW facility during November of 2007 had been manufactured and distributed by Nova Gaming, LLC ("Nova").[141]   The electronic operating systems of each of the machines operated on Nova's proprietary software and, thus, each functioned in the same way.[142]   The only differences between the games lay in the visual images that appeared on video monitors and the amount of maximum bets allowed.[143]   The individual gaming machines displayed various graphic interfaces, and were known by such names as "Fruits Gone Wild," "Diamonds and Daubers," and "Beach Vacation."[144]

Nova's individual bingo consoles were connected to a central computer server that controlled the entire system.[145]   The server connected to and interacted with each of the individual game consoles located at the Triana bingo facility.[146]   Nova connected to the server and its individual machines via the internet, and thereby monitored the manner in which the system functioned.[147]   Because the Nova system

---

[141] *See* doc. no. 61 (Evidentiary Material in Support of Plaintiff's Motion for Summary Judgment), Ex. 8 (Field/Property Evidence Form); *see also* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 101.

[142] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 6, 69-70.

[143] *See id.*

[144] *See id.* at 75-76.

[145] *See id.* at 31, 177.

[146] *See id.* at 41-42.

[147] *See id.*

operated through a server, it could be accessed only with pass codes.[148]  Nova did not

provide the server codes to the actual operators of the games.[149]

Bingo cards appeared on all of Nova's electronic bingo games, including all

of the games played at the Triana facility in November of 2007.[150]  The player could

change the way the screen appeared from a view of the bingo card only, to a "reel

view," which depicted reels in the center of the screen and a bingo card at the bottom

left of the screen.[151]  Before the game began, the player had the opportunity to

determine how many credits he desired to spend.[152]  Possible betting lines were shown

on the screen so that the player could visualize his bet.[153]

Once the game began, the Nova electronic bingo system server randomly

generated numbers.[154]  A win occurred if the randomly-selected numbers matched, in

number and pattern, a grid of numbers assigned to a particular terminal.[155]  The server

continued to select numbers until all numbers on the grid assigned to a particular

---

[148] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 42-44.

[149] *See id.*

[150] *See id.* at 6, 35, 40, 44.

[151] *See id.* at 44-45.

[152] *See id.* at 49-52.

[153] *See id.* at 49, 51, 54.

[154] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 33, 36, 38, 39.

[155] *See id.* at 33-39.

machine had been selected, at which point the "session" ended and a new "session" began;[156] this was also referred to as a closing pattern.[157]  All of the machines paid winnings for intermediate winning patterns during a session, in addition to the final session-ending cover-all pattern.[158]  The "jackpot" for a particular session could be paid either for the session-ending cover-all pattern or some interim winning pattern.[159] There were multiple potential winning patterns within any given session, with each different pattern paying a different winning amount.[160]

A player did not manually cover or mark the numbers that were randomly selected by the computer server as in the ordinary game of bingo, because the electronic machine automatically noted wins and losses.[161]  In other words, the electronic machine — not the player — marked numbers on the bingo card depicted on the player's screen in the following manner:  red for numbers that were selected, yellow for game-ending hits, and green for winning patterns.[162]  If the game was operating in "card" mode, the bingo card was the only item on display and a winning

---

[156] See id. at 56-57, 61.

[157] See id. at. 56, 61.

[158] See id. at 68, 184.

[159] See id. at 68.

[160] See Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 48.

[161] See id. at 142-49.

[162] See id. at 58, 65.

pattern was shown by numbers highlighted in green.[163]  If the game was operating in "reel" mode, however, the reels were in the center of the screen and a winning pattern was reflected by the lining up of certain symbols, such as fruit or 7's, marked by green lines.[164]  Although the Nova gaming system depicted spinning reels during play, the reels did not affect the game.[165]  The reels existed only for entertainment purposes, as an "aid to players to show them what they won."[166]

      **c.**    *The ordinary game of bingo* versus *the manner in which plaintiff's electronic bingo game is played*

Although the electronic format of the bingo card is not itself decisive, the court is troubled by the lack of evidence that the electronic machines at issue here were actually linked with one another in such a way that simulated the traditional bingo hall, in which all players who are present actually and knowingly compete against each other to be the first to achieve a certain winning pattern.  Nova insists that its electronic bingo system will not work unless the server simultaneously interacts with at least two individual bingo consoles,[167] but plaintiff provides no proof that the

---

[163] *See id.* at 59.

[164] *See id.* at 53-54; Deposition of Sergeant Michael Salomonsky, at 68-69, 70-72, 86-87, 115-16, Exhibit 10.

[165] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 45-47, 66.

[166] *Id.* at. 45-47, 66, 71, 93.

[167] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 33, 37, 208.

system requires at least two ( and preferably more) players to simultaneously compete against one another.  On the contrary, the evidence shows that one person may deposit money in two or more machines, causing each game to function.[168]  Michael Fletcher, who testified on behalf of the gaming manufacturer, said as much:

> Here is one thing to clarify.  Because I don't want you coming back and telling me I didn't tell you something.  I don't have any way to tell you that Will don't sit in front of two machines and put money in both of them. Okay?

> So I don't have any way to control that unless I'm standing there. The machine don't know if there is a live person in front of it or not.  *So a live person could be playing five machines*.  You know, the machine just interacts with whoever is interacting with it. Okay?[169]

Even assuming that at least two different persons must simultaneously play at separate consoles in order for the games to function, the evidence provided does not prove that the players competed against each other for a prize.  The fact that each machine was connected to the same server does not alone simulate the traditional bingo hall experience, where each player must not only achieve a pre-announced pattern in order to win, but also must do so before all other competitors attain the winning pattern.  Because the electronic games reward a variety of different winning

---

[168] *See* Deposition of Kenneth R. Burton, Jr., at 192-94; *see* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 182-83.

[169] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 182-83 (emphasis supplied).

patterns, both interim and session-ending, more than one player could win a prize in any given session.

Despite the fact that Nova's machines display a 5 x 5 square matrix on the user interface (the electronic monitor for each console), the most prominent attributes of the machine fit squarely within the statutory definition of a "slot machine." Alabama Code § 13A-12-20(10) defines that term as "[a] gambling device that, as a result of the insertion of a coin or other object, operates, either completely, automatically, or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. . . . " From a player's perspective, one simply inserts money into the plaintiff's electronic bingo machines, decides how many credits to bet, presses a button, and observes the alignment of the slot machine reels to determine whether a win has occurred.[170] Like traditional slot machines, the individual gaming machines display various graphic interfaces, and the games are known by such names as "Fruits Gone Wild," "Diamonds and Daubers," and "Beach Vacation."[171]

---

[170] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 66-67; *see* Deposition of Sergeant Michael Salomonsky, at 70-74, 115-16; doc. no. 58 (Evidentiary Material in Support of Sheriff's Motion for Summary Judgment), Ex. G (Deposition of Investigator Steven Finley), at 16-18; Ex. H (Deposition of Ronald Campos), at 21; Ex. I (Deposition of Deputy Matt Holloway), at 18-19; Ex. J (Deposition of Deputy Kenneth Williams, Jr.), at 18; Ex. K (Deposition of Deputy Joseph Rice), at 14-15; Ex. L (Deposition of Deputy Jermaine Nettles), at 23, 31-32; Ex. M (Deposition of Reserve Deputy George Inglewright), at 16-18.

[171] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 75-76.

The Alabama Supreme Court decided a somewhat similar case in *Barber v. Jefferson County Racing Association, Inc*., 960 So. 2d 599 (Ala. 2007), in which a gaming operator claimed that its electronic gaming operation was a legal sweepstakes, despite the fact that the electronic machines fit the definition of a slot machine.  The Court considered the argument that the operation must constitute a legal sweepstakes because free entries into the sweepstakes were given with the purchase of Internet time at a fair market value.  *See id.* at 612.  The Court also considered the operator's argument that the activity could not be illegal because the operation worked in connection with a computer server to display, in an entertaining fashion, the results of a sweepstakes already decided by the random selection of a computer.  *See id.* at 608-10.  Holding that the electronic machines constituted illegal slot machines under Alabama law, the Court stated "it is axiomatic that one may not lawfully do indirectly what is unlawful to be done directly."  *Id.* at 609.  The court further explained:

> Alabama's gambling law, however, is not so easily evaded.  It is " 'the policy of the constitution and laws of Alabama [to prohibit] the vicious system of lottery schemes and the evil practice of gaming, *in all their protean shapes*.' " *Opinion of the Justices  No. 83*, 249 Ala. 516, 517, 31 So. 2d 753, 754 (1947) (quoting *Johnson v. State*, 83 Ala. 65, 67, 3 So. 790, 791 (1887) (emphasis added)).  In the computer age, the fact that chance takes place at the point of sale rather than at the readers themselves is simply inconsequential.

Thus, the readers are slot machines *as to those who play them*.  * * *

*Barber*, 960 So. 2d at 614-15 (emphasis in original).

Much like the electronic games at issue in *Barber*, the electronic bingo machines in this case feature graphic interfaces that have the appearance of slot machines.[172]  The sweepstakes card readers in *Barber* were said to merely provide an entertaining method to reveal the results of a sweepstakes, though the results were already determined by the randomized action of a computer prior to being revealed by the card readers.  *See id.*  Similarly, the electronic machines at issue in this case are said to provide only an entertaining means of revealing the results of an electronic bingo game conducted in the inner workings of a computer server.[173]  These similarities compel the conclusion that the electronic bingo games at issue in this case constitute illegal slot machines under Alabama law.

Although this court finds that the electronic bingo games at issue in this case are more akin to slot machines than the game commonly known as "bingo," this court need not decide the question of whether the electronic machines constitute "bingo"

---

[172] *See* Deposition of Sergeant Michael Salomonsky, at 68-69, 70-72, 86-87, 115-16, Exhibit 10; Deposition of Ronald Campos, at 22; Deposition of Deputy Kenneth Williams, Jr., at 16-18; Deposition of Deputy Joseph Rice, at 14-15; Deposition of Deputy Jermaine Nettles, at 23, 31-32; Deposition of Reserve Deputy George Inglewright, at 14, 17-18.

[173] *See* Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 44-47.

to resolve the case in defendant's favor.  Even assuming that the electronic machines at issue constitute "bingo" as the term is used in Amendment 387, plaintiff's operation still cannot be considered legal bingo under Alabama law, because it was not conducted in a manner wholly compliant with all of the provisions of Amendment 387.

**2**.    *Nonprofit organization*

Amendment 387 applies only to "[t]he operation of bingo games . . . by nonprofit organizations for charitable or educational purposes."  Plaintiff alleges that the Triana gaming facility was operated by the Texas VFW for charitable purposes. Burton testified, however, that only two individuals associated with the Texas VFW were involved in the Triana gaming operation:  Larry Sepanski and Kymberlee Bradley;[174] and, as discussed in Part II of this opinion, the linkages of those two persons with the Texas VFW were tenuous at best.  It is undisputed that both Sepanski and Bradley became associated with the Texas VFW for the sole purpose of facilitating their involvement in the gaming operation.[175]

Plaintiff alleges that Sepanski, the bingo chairman for the Triana operation,

---

[174] *See* Deposition of Kenneth R. Burton, Jr., at 114, 185, 187-88.

[175] *See id*.; Deposition of Lawrence O. Sepanski, at 10-15, 22-28.

was the member of the VFW in charge of operating the electronic bingo games,[176] but Sepanski had no knowledge of the finances or operation of the enterprise, and no access to the electronic system on which the games were being played.[177]  Similarly, Bradley had neither knowledge of the finances/operation of the enterprise, nor access to the electronic system on which the games were being played.[178]

According to Sepanski, Gomez was the person who was operating the game.[179] Gomez formed multiple limited liability companies, in which he served as principal and sole member,  for the express purpose of running the Triana operation.[180]  Gomez is not a member of the VFW,  nor is he a charity within the meaning of Amendment 387.[181]  By allowing Gomez to operate the bingo games, plaintiff failed to comply with the primary requirement of Amendment 387: "the operation of bingo games . . . by non-profit organizations for charitable or educational purposes."  Because the Triana gaming operations were not protected under Amendment 387, they could not be considered "legal bingo" operations under Alabama law.

---

[176] *See* Deposition of Kenneth R. Burton, Jr., at 114,187-88.

[177] *See* Deposition of Lawrence O. Sepanski, at 30-31, 34, 37-39, 42, 48-49.

[178] *See* Deposition of Kymberlee Roxann Bradley, at Q. 72-112, 119-125, 142, 145-46, 153, 155-57, 160, 181, 186-87, 189.

[179] *See* Deposition of Lawrence O. Sepanski, at 42.

[180] *See* Deposition of Bernard Gomez, at Exhibits 1-13.

[181] *See id.* at 16.

54

**3**.    *Age and time limitations*

Subsection (a) of Amendment 387 prohibits any person under the age of 19 from playing or conducting the game of bingo.  Subsection (b) provides that "no license shall be issued to any nonprofit organization, unless such organization shall have been existence for at least 23 months immediately prior to the issuance of the license."  The parties do not dispute that plaintiff complied with these two provisions of Amendment 387, so further discussion is not necessary.

**4**.    *Owner or lessee*

Subsection (c) of Amendment 387 requires that any bingo game be operated "only on the premises owned or leased by the nonprofit organization operating the bingo game."  In direct conflict with the language of this subsection, section 1 of the Town of Triana's Ordinance provides, in pertinent part, that: "As long as nonprofit organizations are operating the bingo games, the bingo facility may be owned or operated by an individual, partnership, or for profit organization."  To the extent that the ordinance conflicts with the public policy expressed in Amendment 387 subsection (c), the ordinance is void.  *See Barrett*, 705 So. 2d at 531-32.  In order to constitute legal bingo consistent with Amendment 387, an operation must conduct bingo games "only" in a facility that is owned or leased by the non-profit organization

itself.

It is undisputed that Gomez personally leased the premises used as the original location for the gaming operation.[182]  Although the lease for the second location purported to be between the premises owner and "The Department of Texas Veterans of Foreign Wars, Inc., on its own behalf and on behalf of all chartered posts  in the State of Texas," Gomez paid the rent for this location as well.[183]  Also, bingo sessions were conducted on the premises in the names of charities other than the Texas VFW and individual Texas VFW posts, including, for example, the Triana Historical Society, whose names do not appear on the lease.[184]  Even assuming that a lease to multiple entities is generally permissible under subsection (c), the games at the Triana operation were operated in the names of several charities other than the VFW and, therefore, do not comply with subsection (c) of Amendment 387.

**5**.   *Contracts*

Subsection (d) of Amendment 387 provides:

> No nonprofit organization shall enter into any contract with any individual, firm, association or corporation to have said individual or entity operate bingo games or concessions on behalf of the nonprofit

---

[182] *See* Deposition of Bernard Gomez, at 41-42.

[183] *See id.* at 70, 77; Deposition of Kenneth R. Burton, Jr., at 143-45.

[184] *See* Deposition of Sharron Humphrey, at Exhibit 17; *see* Deposition of Bernard Gomez, at 58, 118.

organization, nor shall said nonprofit organization pay consulting fees to any individual or entity for any services performed in relation to the operation or conduct of a bingo game.

Although Town of Triana Ordinance No. 2006-05, section 4, does not authorize non-profit organizations to enter into contracts for the operation of bingo games or for the performance of services in relation thereto, the ordinance does permit expenses to be paid in connection with the conduct of bingo games. The ordinance provides that:

No item of expense shall be incurred or paid in connection with the operating or conducting of any game of bingo except the following bona fide expenses may be incurred or paid in amounts bearing a reasonable relationship to that proportion of the total expense attributable to the conduct of bingo games:

(a) The purchase, lease, or rental of equipment necessary for conducting bingo on terms established by industry standards, including but not limited to payment for wear and tear, depreciation, maintenance, or repair of equipment;

(b) Cash prizes or the purchase of prizes of [*sic*] merchandise;

(c) Rental of the location at which bingo is conducted, subject however, to subparagraph (5) of this section;

(d) Utilities;

(e) Janitorial services;

(f) The fee required for issuance or reinsurance of a license to operate bingo games;

(g) Security services;

(h) Food preparation services;

(i) Other reasonable expenses incurred by the license holder not inconsistent with this ordinance.

Despite plaintiff's obvious effort to fit its payments to Gomez within the exceptions created by the Town of Triana Ordinance, plaintiff's model of operation still violates subsection (d) of Amendment 387.  Regarding the structuring of the gaming operation, Burton made arrangements for Gomez to run the operation, discussing with Gomez that his payment would need to be based upon the structuring of companies to perform functions for the service of the operation.[185]  Pursuant to this agreement, Gomez formed multiple limited liability companies and caused the execution of formal written contracts between those companies and Texas VFW.[186]

Although by name alone, Gomez's catalogue of companies resembles the list of *bona fide* expenses enumerated in the Town of Triana ordinance, the true intent

---

[185] *See* Deposition of Kenneth R. Burton, Jr., at 52-53.

[186] *See* Deposition of Bernard Gomez, at Exhibits 1-13.

58

behind the formation of the companies is evident.  These companies were created to facilitate the payment of fees to Gomez for services that he performed in relation to the operation of the bingo games.  As the principal and sole member of these limited liability companies, Gomez retained ninety percent of the gross receipts from the gaming operation.[187]  By entering into contracts for the operation of bingo games and for the performance of related services, plaintiff violated subsection (d) of Amendment 387 and, therefore, its operations cannot be considered legal bingo under Alabama law.

**6**.    *Lending of Nonprofit Name*

Subsection (e) of Amendment 387 prohibits a nonprofit organization from lending its name to, or allowing its identity to be used by, any other person or entity operating a bingo game in which the  nonprofit organization is not "directly and solely operating said bingo game."  Although the use of the term "solely" compels the conclusion that Amendment 387 contemplates the operation of bingo games only by a single non-profit entity, the Town of Triana ordinance states that "[i]t is anticipated by the Town of Triana that multiple licensed nonprofit organizations will operate

---

[187] *See* Deposition of Kenneth R. Burton, Jr., at 61.  Gomez did, however, pay twenty-five percent of these gross receipts to Nova Gaming for the provision of electronic bingo machines. *See* Deposition of Bernard Gomez, at 102; Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 204-05.

bingo games at the same time in a bingo facility."  Town of Triana Ordinance No. 2006-05, § 4 (2).  Even so, in order to constitute legal bingo  under Amendment 387, each non-profit organization must "directly and solely" operate its own bingo games.

It is undisputed that the Triana gaming devices were being operated in the names of at least twenty to twenty-five different "charities," including multiple individual Texas VFW posts.[188]  Each of these posts is a separate and autonomous non-profit corporation, and no member of any post ever had any involvement in running the Triana gaming operation.[189]  Moreover, the individual machines were not assigned to particular charities, and the participation and/or division of play between the charities was not visible to the players.[190]  Bingo games operated on behalf of twenty to twenty-five separate entities cannot possibly fit within the parameters of Amendment 387; that is, the games cannot be operated "solely" by  "said non-profit organization" as required by the Amendment.

It is also evident that the nonprofit organizations involved in the gaming operation were not "directly" operating the game.  As discussed at length above, the operation was run by Gomez and Nova.  Because the plaintiff allowed its name to be

---

[188] *See* Deposition of Sharron Humphrey, at Exhibit 17; Deposition of Bernard Gomez, at 58, 118.

[189] *See* Deposition of Kenneth R. Burton, Jr., at 22.

[190] *See* Deposition of Bernard Gomez, at 114-17.

used by Gomez and Nova in the operation of games which the plaintiff was not

"directly and solely operating," plaintiff violated subsection (e) of Amendment 387.

**7**.    *Prize limitations*

Pursuant to subsection (f) of Amendment 387:

> Prizes given by any nonprofit organization for the playing of bingo
> games shall not exceed $1,000.00 in cash or gifts of equivalent value
> during any bingo session or $2,000.00 in cash or gifts of equivalent
> value during any calendar week.

Anticipating an operation in which multiple licensed nonprofit organizations would

conduct bingo games at the same time, Triana Ordinance No. 2006-05 provides that:

"The total prizes awarded shall not exceed ($1,000.00) *per nonprofit organization*

(example: if ten nonprofit organizations are operating bingo games at the same time

then the total prizes given out by the nonprofit organizations shall not exceed

$10,000.00 for any session[)]."  (Emphasis supplied.)  According to the ordinance,

the prize limitations can be multiplied by the number of charities participating in the

gaming operation, so that much larger payouts can be made per session.  Because this

stacking of prize limitations runs contrary to the explicit $1,000 per session prize

limitation, and defeats the purpose behind Amendment 387,  subparagraph (2) of

Town of Triana Ordinance 2006-05 is void.

Although the evidence is unclear as to whether a player at the Triana facility

could win more than $1,000 in a single session, it is undisputed that hundreds of sessions were played per day, and that players could and did win more than $2,000 in a single day.[191]   It also is undisputed that electronic displays on the gaming consoles advertised jackpot prize amounts ranging from a few hundred dollars to more than $10,000.[192]   Plaintiff takes the position that the "per session" prize limitations apply separately to each entity participating in the operation.  Although such a view may be consistent with the language of Town of Triana Ordinance No. 2006-05, the text of Amendment 387 does not permit a payout of more than $1,000 in any one session.

### 8.   *Payment of fees*

Subsection (g) of Amendment 387 provides that "[n]o person or organization, by whatever name or composition thereof, shall take any salary, expense, money, or fees as remuneration for services rendered in the operation of any bingo game." Texas VFW violated this subsection by paying money to Gomez and Sepanski for services rendered in connection with the Triana gaming operation.

Pursuant to his agreement with Burton, Gomez received compensation for running the Triana operation through payments made to the multiple limited liability

---

[191] *See* Deposition of Michael E. Fletcher, at 84, 129-31, Exhibit 5.

[192] *See id.* at 186-96; *see* Deposition of Sergeant Michael Salomonsky, at 59-61, Exhibit 10.

companies that he formed to facilitate the operation.[193]  As the principal and sole member of  those companies, Gomez retained ninety percent of the gross receipts from the gaming operation.[194]  In addition to the earnings that Gomez received from contracts between the Texas VFW and his companies, Burton and Gomez agreed that Gomez would receive a $30,000 fee after he "put everything in place."[195]

As "chairman of bingo operations" for the Texas VFW, Larry Sepanski also earned  $17 a day for looking in on the Triana gaming operations and greeting some customers.[196]  Sepanski received a payment of $170 for ten visits made to the Triana gaming operation in 2007.[197]

By paying money or fees to Gomez and Sepanski as remuneration for services rendered in the operation of bingo games, plaintiff violated subsection (g) of Amendment 387 and, therefore, plaintiff's operations cannot be considered legal bingo under Alabama law.

## V.  CONCLUSIONS

---

[193] *See* Deposition of Kenneth R. Burton, Jr., at 52-53.

[194] *See* Deposition of Kenneth R. Burton, Jr., at 61.  Gomez paid twenty-five percent of these gross receipts to Nova Gaming for the provision of electronic bingo machines.  *See* Deposition of Bernard Gomez, at 102; Deposition of Nova Gaming, LLC representative Michael E. Fletcher, at 204-05.

[195] *See* Deposition of Bernard Gomez, at 56.

[196] *See* Deposition of Lawrence O. Sepanski, at 13-15, Exhibit 5 (Letter to Sepanski from Texas VFW).

[197] *See id.* at 24-25, 57, Exhibit 4 (Itemized list for Texas VFW Check No. 12147).

Regardless of whether plaintiff's electronic bingo machines constitute "bingo" under Alabama law, the Triana gaming operation utilizing those machines cannot be considered legal because plaintiff failed to comply with other provisions of Amendment 387. The games were not operated by a charity. They were not operated only on a premises owned or leased by the entity on whose behalf the game was played. Multiple individuals and companies contracted to provide services for the gaming operation, in exchange for a fee or percentage of receipts. The games were not conducted "directly and solely" by a single nonprofit entity. Prizes awarded may have exceeded the explicit dollar limitations for prizes. Because the court concludes that plaintiff has violated various provisions of Amendment 387, the court need not consider the question of whether the Nova electronic machines constitute "bingo" as the term is used in Amendment 387.

Accordingly, this court concludes that, because plaintiff cannot demonstrate its compliance with the requirements of Amendment 387 discussed in Part IV(E) of this opinion, plaintiff is not entitled to judgment as a matter of law on the legality of its electronic bingo games.

In Count I, plaintiff contends that its constitutional rights were violated when the Sheriff subjected plaintiff to an unreasonable search and seizure of plaintiff's property in violation of the Fourth Amendment. In Count II, plaintiff advances a

claim under 42 U.S.C. § 1983, alleging that defendant violated the Equal Protection Clause of the Fourteenth Amendment by selectively enforcing the Alabama criminal statutes discussed in Part III(A) of this opinion.   In Count III, plaintiff advances another claim under § 1983, based on the due process doctrine of vagueness.   In Count IV, plaintiff alleges that the criminal statutes applicable to bingo games in Alabama are void for vagueness.   Count V of plaintiff's complaint requests a judgment under the federal declaratory judgment statute, 28 U.S.C. § 2201, declaring that the bingo games operated by plaintiff complied with Town of Triana Ordinance No. 2006-05 and other applicable Alabama laws, and that the possession of electronic bingo machines does not violate Alabama Code § 13A-12-27.   Plaintiff also seeks a declaration that its operation of bingo games in Triana, Alabama complied with Ordinance No. 2006-05 and other applicable Alabama law, and that it did not violate Alabama Code § 13A-12-27.   In Count VI, plaintiff requests preliminary and permanent injunctive relief to prohibit defendant from interfering with its operations.

Upon consideration, the court concludes that plaintiff failed to meet the explicit requirements set out in Amendment No. 387 which govern the operation of bingo games in Madison County, Alabama.   Because plaintiff cannot demonstrate its compliance with all of the requirements of Amendment 387, its gaming operations cannot be considered exempt from the general prohibition of lotteries in Article IV,

section 65 of the 1901 Alabama Constitution and Alabama Code §§ 13A-12-22 and 13A-12-27.  Accordingly, plaintiff's gaming operations violated Alabama Code §§ 13A-12-22 and 13A-12-27.

Because plaintiff cannot demonstrate that defendant lacked probable cause to believe that plaintiff's bingo operations were in violation of Alabama law, the foundation of Counts I,  II, V, VI, and VII of plaintiff's complaint is lost, and defendant is entitled to judgment as a matter of law.  As to Counts III and IV, the court finds that the laws applicable to bingo games in Madison County, Alabama are not void for vagueness.  "'A statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning.'"  *Barber*, 960 So. 2d at 616 (quoting *Bowers v. State*, 283 Md. 115, 125, 389 A.2d 341, 347 (1978)).  Neither the Alabama Constitution, nor Amendment 387, is ambiguous about the requirements for a legal bingo operation, and plaintiff has not demonstrated that the statutory scheme is unconstitutional.  Accordingly, defendant also is entitled to judgment as a matter of law on Counts III and IV.

An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 28th day of September, 2009.

_____
United States District Judge